

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-13-00051-CV

---

WARREN WHISENHUNT, Appellant

V.

MATTHEW LIPPINCOTT AND CREG PARKS, Appellees

---

On Appeal from the County Court at Law
Hopkins County, Texas
Trial Court No. CV41303

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# O P I N I O N

Warren Whisenhunt sued Matthew Lippincott and Creg Parks for defamation, tortious interference with existing business relationships, tortious interference with prospective business relationships, and civil conspiracy. Lippincott and Parks sought dismissal of these claims pursuant to the recently-enacted Texas Citizens Participation Act (TCPA), also known as the Anti-SLAPP[1] statute, which is contained in Chapter 27 of the Texas Civil Practice and Remedies Code. The TCPA is designed to prevent plaintiffs from bringing frivolous lawsuits based on an exercise of free speech. It provides for a pre-discovery dismissal mechanism that requires a plaintiff to make a prima facie case on each claim by "clear and specific evidence" to avoid dismissal of the suit and the imposition of attorney's fees and sanctions. Applying the TCPA, the trial court dismissed all of Whisenhunt's claims, except for his claim for defamation; in addition, attorney's fees were awarded to Lippincott and Parks. Because we conclude that the TCPA did not apply to Whisenhunt's suit (this being an issue dispositive of the points of error raised by both parties), we reverse the trial court's judgment and remand the case to the trial court for further proceedings.

## I.     Facts Giving Rise to a Private Dispute

Whisenhunt is a Certified Registered Nurse Anesthetist who is a member and Vice President of SafeNET Anesthesia Services, P.L.LC. ("SafeNET"). SafeNET became "an independent contractor and exclusive provider of anesthesiology services for a company called

---

[1] "SLAPP" stands for Strategic Lawsuits Against Public Participation. *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 719 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

First Surgery Suites, LLC ('FSS')."   Whisenhunt is also a partner in FSS and owns approximately five percent of that company.

In May 2010, Lippincott was hired as an administrator for FSS and immediately suggested that his wife, who was an anesthesiologist, should work at FSS despite the exclusive contract with SafeNET which remained effective for a set term.  FSS hired Parks and his company, Alliance Managed Healthcare, L.L.C. ("AMH"), in January 2011 to administer the business of FSS.  Parks worked under Lippincott's direction, and "the two began jointly managing the daily operations and administration of FSS."

Whisenhunt's petition alleged that Lippincott was an employee or partner of AMH and that "[s]hortly after Parks' assumption of the position, both Defendants proposed replacing SafeNET with another anesthesiology provider at FSS," which Whisenhunt characterized as "an anticipated breach of the companies' exclusive anesthesia services contract."  In May 2011, Parks and Lippincott allegedly contacted third parties and interviewed alternative providers of anesthesia services, "pressuring Whisenhunt to alter the exclusivity provisions of the contract with FSS."  The petition claimed that Parks told members of FSS and three other parties that Whisenhunt had been responsible for the loss of surgical patients at FSS.

Parks was terminated by FSS March 28, 2012, as a result of the FSS partners' decision that he, according to Whisenhunt's petition, had "grossly mismanaged collections as well as other acts of incompetence."  Whisenhunt's petition claimed that Parks and Lippincott continued publishing disparaging comments about Whisenhunt to others interested in conducting business

3

with him even after Parks' termination, including charges that Whisenhunt had sexually harassed the facility's nurses, had engaged in fraudulent behavior, was unavailable for surgeries, and was incompetent as an anesthetist. Attached to Whisenhunt's petititon were internal emails Lippincott had sent in May 2012 that contained the following language:

> Most recently multiple departing employees have made the following statements to me, and I am under the impression that they have filed reports to this effect with Board of Nursing and other regulatory groups, but I have no idea how to confirm that. Also, I have no idea if these are to be treated as unsubstantiated claims from individuals, or if there are obligations for FSS to handle them in a certain way:
>
> - SafeNet owner representing self to be a physician - witness statement only.
> - Continued violation of sterile protocol policy - witness statement only.
> - SafeNet owner endangering patients for personal financial gain by ordering staff to proceed with cases when during pre op it is discovered that patients have eaten recently or have cardiac issues that should be assessed first. - witness statement only.
> - Obstruction of reporting processes and corrective action - witness statements
> - Reports of harassment going undocumented. - witness statements
>
> Other reports on file, some or all of which may have been submitted to the Board of Nursing:
>
> Incident reporting form #00001
> States that falsification of scrub tech record on 11/2/2010 and 12/17/2010 was at the direction of Administrator and Director of Nursing Warren Whisenhunt, (not sure if Warren still had the DoN[2] title at this time but the report describes him as such). States that Maria and Leigh Ann Simpson were instructed to do this by Warren. Report prepared by Maria and signed by Maria, Leigh Ann, Josh Green and Tina Bullard. It is not specifically stated when Tina learned of this, and who told her about it.

---

[2]From the context, it appears that the acronym "DoN," as used here, stands for "Director of Nursing."

4

Incident reporting form #00004
States that on 2/3/2011 Warren left before a 1 year old child had met discharge criteria. It was prepared by Leigh Ann and signed by Maria and Janet.

Incident reporting form #00005
States that on 3/31/2011 Warren failed to provide adequate coverage for pediatric cases. It was prepared and signed by Maria.

Incident reporting form #00006
States that Warren placed an IV when Tina was supposed to do so, in addition to administering a different narcotic than was ordered prior to pre-op or patient consent being completed. It was prepared by Leigh Ann and is signed by Leigh Ann and Tina.

Other reports for which there are some records such as written statements and/or presumably Board of Nursing complaint records:
- Witnesses supported reports of workplace sexual harassment and unwanted physical contact by a superior and attempts to make inappropriate contact with employee outside of the workplace. - multiple witness statements, emails, etc.
- Reports of collecting cash and checks from patients and ordering employees not to make receipts or other records were witnessed and reported by multiple employees, several of which are still employed.
- Participation in allowing the hiring of an employee ineligible for employment due to criminal record.

Issues reported and documented by staff that the DoN is responsible for preventing. Scans of chart, log and other documents have been provided and can be made available:

- 2 reports of wrong physician name on consent.
- Reports of patient arm bands not being used.
- Required confirmation from DoN of completion of patient order and chart review, etc. not provided as required by policy.
- Chart status, case detail, etc. not recorded anywhere less than 24 hours before case is scheduled to begin.
- Failure to comply with DoN chart & case review/"Check off" requirement for all cases.

5

- Cscope patient who was fed when he should not have been preoperatively, causing him to become ill. Reported by third party medical staff.
- 2 hour wait by patient in pre-op with no one coming to check on her. (hand written report), when reported to FSS owners DoN and Administrator took action making it very difficult for any incidents like this to be identified and reported to the Medical Executive Board, QAPI or other entities.
- Pre-initialing central scheduling sheets before patient and other data had been received, reviewed, etc.

. . . .

Some of the supporting documents available include:

2 reports of wrong physician name on consent. Example shows Dr. Hester referenced at the top of the page and Dr. Hackbarth (the physician providing the treatment) at the bottom.
Scan # 102313
Scan # 102303

Reports of patient arm bands not being used.
Scan # 102239

Required confirmation from DoN of patient order review, completion, etc. not provided as required by policy. Patient case scheduled without these steps completed.
Scan # 155528

Chart status, case detail, etc. not recorded anywhere less than 24 hours before case begins - and several days after cases had been scheduled. In this example there was none of the required data available as of 4/16 for 6 cases that took place on 4/17.
Scan # 155341

Failure to comply with DoN chart & case review/"Check off" requirement for all cases, prior to cases being scheduled.
Scan # 155441
Scan # 155152

6

Following attachment was sent after the cases listed were performed (showing that the documentation was still incomplete):
Scan # 155252, 123409, 123458, 123545, 123649, 123718, 123328, 123344

Despite having nearly 8 months to complete the work, little to nothing has been completed for infection control programs and other survey preparedness activities.[3]

Whisenhunt filed suit November 16, 2012, against Lippincott and Parks for defamation, tortious interference with existing and prospective business relationships, and conspiracy to interfere in business relationships.[4]   Whisenhunt complained that the various unsavory statements about him were untrue.  To partially show the untruthfulness of the statements, Whisenhunt produced an affidavit from Gary Boyd, a physician and the Medical Director of FSS, stating that FSS received no formal or informal complaints against Whisenhunt until after Parks was fired and that FSS had terminated its contractual relationships with AMH.  Boyd stated that CSS was "very happy with the quality of the nurse anesthesia services that have been provided by [SafeNet] [and] Whisenhunt" and described Whisenhunt as "very professional."

Lippincott and Parks moved to dismiss the suit January 13, 2013, interposing the TCPA as a bar to Whisenhunt's claims.  The filing of such a claim abates any discovery until the issue of its applicability is resolved.

---

[3]Whisenhunt also alleged that Parks and Lippinscott filed a false allegation against him with the Texas State Board of Nursing.  This allegation was denied.

[4]Lippincott and Parks' answer to the suit invoked the TCPA and claimed that the communications were privileged, the defamation claim was barred by the statute of limitations, and that Whisenhunt was not entitled to recover as an individual on a contract executed by SafeNET since SafeNet was not a party to the suit.

Whisenhunt responded to the motion to dismiss by arguing the inapplicability[5] of the TCPA and claiming, alternatively, that even if the chapter applied to the suit he had brought, the court could not dismiss the action because he could establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) (West Supp. 2012).

The trial court entered its ruling on this controversy by order entered March 4, 2013, wherein it found that Whisenhunt "met the minimum threshold to proceed with the defamation cause of action" but did not "provide clear and specific evidence to proceed with the tortious interference claims and the claim of conspiracy." On March 15, 2013, the trial court denied the motion to dismiss "with regard to Plaintiff's claim for Defamation" but granted the motion to dismiss "with regard to Plaintiff's claims for Tortious Interference with Existing Business Relationships, Tortious Interference with Prospective Business Relationships and Conspiracy to Interfere with Business Relations." The trial court also awarded court costs and $2,887.50 in

---

[5]Whisenhunt also argued that the following exception in the statute applied to his suit:

> This chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product or a commercial transaction in which the intended audience is an actual or potential buyer of customer.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b) (West Supp. 2012). Whisenhunt argued that Lippincott and Parks "were engaged in the commercial sale of medical services in connection with their positions at" FSS, the speech about Whisenhunt arose "out of their business interactions with Plaintiff and with their sale of medical services at FSS," and the intended audience of the allegedly defamatory statements was third parties interested in conducting business with Whisenhunt. Because we conclude that the statute does not apply, we need not decide whether the commercial speech exception applies in this case. Worth mentioning, however, is the fact that this exception to TCPA's applicability applies where a statement is made to a limited audience and not the public at large. *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, No. 01-12-00990-CV, 2013 WL 3716693, at *5 (Tex. App.—Houston [1st Dist.] Jul. 16, 2013, pet. filed).

attorney's fees[6] to Lippincott and Parks based on their written claim for fees and their attorney's affidavit.

## II.     The TCPA Does Not Apply

Lippincott and Parks bore the initial burden of demonstrating the TCPA's applicability. *Wholesale TV & Radio Adver., LLC v. Better Bus. Bureau of Metro. Dallas, Inc.*, No. 05-11-01337-CV, 2013 WL 3024692, at *2 (Tex. App.—Dallas Jun. 14, 2013, no pet.) (mem. op.); *Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, Inc.*, 402 S.W.3d 299, 307 (Tex. App.—Dallas 2013, pet. filed).

The trial court's initial determination that Lippincott and Parks showed by a preponderance of the evidence that the legal action was based on their exercise of free speech is subject to de novo review. *KTRK Television, Inc. v. Robinson*, No. 01-12-00372-CV, 2013 WL 3483773, at *5 (Tex. App.—Houston [1st Dist.] July 11, 2013, no pet. h.) (citing *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, No. 01-12-00581-CV, 2013 WL 1867104, at *6 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet. h.)).

Both parties believe the rules of statutory construction support their respective positions. Since the issue of statutory construction is a question of law, we review it de novo. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). When construing a statute, our

---

[6]Section 27.009 states that court costs and reasonable attorney's fees "shall" be awarded to the moving party "[i]f the court orders dismissal of a legal action under this chapter." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1) (West Supp. 2012). A "legal action" is defined as a "lawsuit, cause of action, petition, complaint, cross-claim or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6) (West Supp. 2012).

primary objective is to ascertain and give effect to the Legislature's intent. TEX. GOV'T CODE ANN. § 312.005 (West 2013); *Molinet*, 356 S.W.3d at 411. "We look first to the statute's language to determine that intent, as we consider it 'a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent.'" *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999)); *see Molinet*, 356 S.W.3d at 411. We consider the statute as a whole rather than focusing upon individual provisions. *TGS– NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). If a statute is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results. *Id.* (citing *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004)).

The right of free speech is guaranteed under both the United States[7] and Texas[8] Constitutions. The tort of defamation creates an exception to these broad guarantees. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974); *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994) (noting "[e]very defamation action that the law permits necessarily inhibits free speech"). The TCPA recognizes the need to protect those filing meritorious defamation claims

---

[7]Amendment I to the United State Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

[8]Article I, Section 8 of the Texas Constitution states, "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8.

but seeks to punish or deter, through the assessment of attorney's fees and sanctions, those who abuse this tort action to silence others who otherwise have a constitutional right to speak freely.

The stated purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (West Supp. 2012).[9]  The "[e]xercise of the right to free speech" is defined as "a communication[10] made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3) (West Supp. 2012).  The phrase "[m]atter of public concern" is defined by the statute as "an issue related to:  health or safety; environmental, economic, or community well-being; a public official or public figure; or a good, product, or service in the marketplace." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7) (West Supp. 2012).

Lippincott and Parks argued that the "email string presented by Whisenhunt" and authored by Lippincott "[is] related to matters of public concern in the areas of health and safety, community well-being and a service in the marketplace."  Whisenhunt responds by arguing that interpretation of the statute in that manner conflicts with the statute's also-stated purpose of

---

[9]The Act requires a court to "dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech." TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003, 27.005(b)(1) (West Supp. 2012).

[10]A communication "includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1) (West Supp. 2012).

11

protecting "the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002.[11]

"[N]ot all speech is of equal First Amendment importance. It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (footnote omitted) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978)). The purpose of the statute is to "petition, speak freely, associate freely, *and otherwise participate in government*." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (emphasis added). As stated in *Dun & Bradstreet*, "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Dun & Bradstreet*, 472 U.S. at 759 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). "'[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Dun & Bradstreet*, 472 U.S. at 759 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)).

There is a distinction between the protections afforded to private speech versus public speech. *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013) (citing *Dun & Bradstreet*, 472 U.S. at 60) (speech solely in individual interest of speaker and his specific business audience warrants no special protection when wholly false and clearly damaging to victim's business reputation). The phrase "matter of public concern" is not new to our jurisprudence. When a defamatory

---

[11]We must give "effect to all words so that none of the statute's language is treated as surplusage." *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010).

statement involves a matter of public concern, private individuals suing for defamation have long

been required to prove actual malice, but even so, this assumes that the matter was publicly

communicated, usually through a media defendant. *See Bentley v. Bunton*, 94 S.W.3d 561, 580

(Tex. 2002); *Klentzman v. Brady*, 312 S.W.3d 886, 898 (Tex. App.—Houston [1st Dist.] 2009,

no pet.). By including the phrase "otherwise participate in government," it appears the

Legislature intended to protect free speech that rises to such a level that it can be considered

participation in government. In other words, the speech must be exercised in the form of public

communication.

"Under the Code Construction Act, we may look to the statute's legislative history in

gleaning the Legislature's intent." *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999) (citing

TEX. GOV'T CODE ANN. § 311.023(3) (West 2005)). Our reading of the TCPA is bolstered by

the sponsor's May 14, 2011, statement of intent, which contains the following reasoning for

enacting the statute:

> Citizen participation is the heart of our democracy. Whether petitioning the government, writing a traditional news article, or commenting on the quality of a business, involvement of citizens in the exchange of idea[s] benefits our society.

> Yet frivolous lawsuits aimed at silencing those involved in these activities are becoming more common, and are a threat to the growth of our democracy. The Internet age has created a more permanent and searchable record of public participation as citizen participation in democracy grows through self-publishing, citizen journalism, and other forms of speech. Unfortunately, abuses of the legal system, aimed at silencing these citizens, have also grown. These lawsuits are called Strategic Lawsuits Against Public Participation or "SLA[P]P" suits.

> Twenty-seven states and the District of Columbia have passed similar acts, most commonly known as either "Anti-SLAPP" laws or "Citizen Participation Acts"

13

that allow defendants in such cases to dismiss cases earlier than would otherwise be possible, thus limiting the costs and fees. The Texas Citizen Participation Act would allow defendants—who are sued as a result of exercising their right to free speech or their right to petition the government—to file a motion to dismiss the suit, at which point the plaintiff would be required to show by clear and specific evidence that he had a genuine case for each essential element of the claim. In addition, if the motion to dismiss is granted, the plaintiff who has wrongly brought the lawsuit may be required to pay attorney's fees of the defendant.

C.S.H.B. 2973 amends current law relating to encouraging public participation by citizens by protecting a person's right to petition, right of free speech, and right of association from meritless lawsuits arising from actions taken in furtherance of those rights.

Senate Comm. on State Affairs, Bill Analysis, Tex. H.B. 2973, 82nd Leg., RS (2011). The statement of intent confirms the concept gathered from reading the statute as a whole that the Legislature was attempting by this law to protect a citizen's public participation.[12] Otherwise, pre-discovery dismissals, attorney's fees, and sanctions would loom over any plaintiff filing an action for private defamatory speech, which would have the effect of chilling meritorious private defamation suits, a result neither intended nor required under the TCPA.

Lippincott and Parks argue that to the extent the emails refer to Whisenhunt, "they relate to his conduct as a nurse and whether that conduct should be reported to the Texas Board of

---

[12]We do not mean to imply that the free speech at issue must be related to participation in government, but only that the speech must be communicated publicly. "The Legislature could have limited the protection provided by the TCPA to the exercise of free speech relating to participation in government, but did not do so. Because the statutory definition of issues representing a 'matter of public concern' is not ambiguous, we must enforce it as written." *BH DFW, Inc.*, 402 S.W.3d at 308 (citing *Combs*, 340 S.W.3d at 439). "[T]he First Amendment protects speech conveying information about products and transaction in the commercial marketplace." *John Moore Servs., Inc.*, 2013 WL 3716693, at *4 (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503–04 (1996); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)).

Nursing."[13]  They cite to a recent case where the Houston First District Court found that "[t]he business of operating an assisted living facility is a highly regulated one," and held that a newspaper which published allegedly defamatory statements was protected by the TCPA because it was communicating a matter of public concern and was, thus, exercising its right of free speech. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, No. 01-12-00581-CV, 2013 WL 1867104, at *7 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet. h.).  The court also noted that the newspaper's statements were a matter of public concern because residents of an assisted living facility retain the right to choose their own health care professionals. *Id.*  However, *Crazy Hotel* differs from the case here because it involved a case where information was published to the public in a newspaper, whereas the allegations in this case were not.

We also bear in mind the circumstances under which the statute was enacted and the consequences of any particular construction. *Phillips*, 995 S.W.2d at 658 (citing TEX. GOV'T CODE ANN. § 311.023(2), (5)).  Further, we presume that the Legislature acted with knowledge of the common law and court decisions.  *Id.*  Our review of TCPA caselaw reveals dismissals involving articles published to the public, business ratings available to the public, and statements made on websites about public figures, goods, products, or services.  In all of these free speech cases, the allegedly actionable statements not only involved matters of public concern, they were also readily available to the public. *See generally Robinson*, 2013 WL 3483773 (involving suit

---

[13]At the hearing, Lippincott and Parks' attorney told the court, "My clients, you know, deny that they made any reports to the Board of Nursing."

brought against television broadcaster for defamation following news story on financial mismanagement at local school); *Crazy Hotel Assisted Living, Ltd.*, 2013 WL 1867104 (involving articles published in newspaper relating to problems at assisted living center); *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (involving suit by company against candidate running for office who posted on website that company contributed money to opponent's campaign to get government contracts); *Wholesale TV & Radio Advertising, LLC*, 2013 WL 3024692 (involving BBB's F rating of business); *BH DFW, Inc.*, 402 S.W.3d 299 (same); *Better Bus. Bureau of Metro. Dallas, Inc. v. Ward*, 401 S.W.3d 440 (Tex. App.—Dallas 2013, pet. filed) (same); *Avila v. Larrea*, 394 S.W.3d 646 (Tex. App.—Dallas 2012, pet. denied) (suit brought by lawyer against Spanish television station for broadcasting allegedly defamatory statements and posting them on internet suggesting lawyer was defrauding undocumented immigrants).[14] Based on this case study, we believe that if a person is not exercising his right to speak freely in public, the TCPA will not apply to suits filed against him.

---

[14]We distinguish this case from *In re Lipsky*, No. 02-12-00348-CV, 2013 WL 1715459 (Tex. App.—Fort Worth Apr. 22, 2013, orig. proceeding), a right to petition case. In that case, property owners filed complaints with the Environmental Protection Agency against Range Resources Corporation, alleging the latter was responsible for contaminating their water well through oil and gas drilling activities. While the EPA's investigation found that Range's activities contaminated the water, the Texas Railroad Commission found that the contamination was not caused by Range. *Id.* The property owners eventually sued Range. *Id.* at *2. Range counterclaimed for defamation, among other causes of action, and contended that their deep shale fracking could not have contaminated the shallow water well. *Id.* The property owners moved to dismiss the company's counterclaims under the TCPA, but the trial court denied the motions. *Id.* at **2–3. The court found that Range's claims fit within the TCPA because they were based on the property owners' rights to petition and encourage review of the issue by the EPA, a governmental body. *Id* at *6. The court also wrote that the environmental effects of fracking was a matter of public concern. *Id.* at *7.

16

A review of the anti-SLAPP legislation in other states, which was referenced in the sponsor's statement of intent, also supports the conclusion reached here. The anti-SLAPP statutes in California, the District of Columbia, Louisiana, Maryland, Nevada, Vermont, and Washington specifically protect only those statements made to the public or in a public forum.[15] Because anti-SLAPP statutes in the following jurisdictions only protect either the right to petition or speech made before a governmental body, there is no dismissal mechanism for communications made about matters of public concern that are not made in a public forum: Arizona, Arkansas, Delaware, Florida, Georgia, Guam, Hawaii, Illinois, Maine, Massachusetts, Minnesota, Nebraska, New Mexico, New York, Oklahoma, Pennsylvania, Rhode Island, Tennessee, and Utah.[16] The Anti-SLAPP legislation adopted by Indiana[17] and Oregon,[18] respectively, contains language similar to the TCPA, but no cases in those jurisdictions have applied the anti-SLAPP law to private speech.

Considering the language of the statute as a whole, the Legislature's statement of intent, and existing law, which was referenced by the Legislature, we conclude that the TCPA does not

---

[15]CAL. CIV. PROC. CODE § 425.16(e); D.C. CODE §16-5501; LA. CODE CIV. PROC. ANN. art. 971; MD. CODE ANN., CTS. & JUD. PROC. § 5-807; NEV. REV. STAT. § 41.637; VT. STAT. ANN. tit. 12, §1041; WASH. REV. CODE § 4.24.525.

[16]ARIZ. REV. STAT. ANN. § 12-751; ARK. CODE ANN. § 16-63-503; DEL. CODE ANN. tit. 10, § 8136; FLA. STAT. § 768.295; GA. CODE ANN. § 9-11-11.1(c); 7 GUAM CODE ANN. §§17101–17109; HAW. REV. STAT. § 634F-1; 735 ILL. COMP. STAT. 110/15; ME. REV. STAT. tit. 14, § 556; MASS. GEN. LAWS ch. 231, § 59H; MINN. STAT. § 554.01; NEB. REV. STAT. § 25-21,241; N.M. STAT. ANN. § 38-2-9.1, 9-2; N.Y. CIV. RIGHTS LAW §§ 70-a, 76-a; OKLA. STAT. tit. 12, § 1443.1; 27 PA. CONS. STAT. § 7707 & 8301–8303; R.I. GEN. LAWS §§ 9-33-1, 9-33-4; TENN. CODE ANN. § 4-21-1003; UTAH CODE ANN. §§ 78B-6-1401, 78B-6-1405.

[17]IND. CODE § 34-7-7-2.

[18]OR. REV. STAT. § 31.150.

apply to speech that is only privately communicated. Only under such an interpretation can both purposes of the TCPA be served. Thus, the TCPA did not apply to the claims raised against Lippincott and Parks.

## III. CONCLUSION

We reverse the trial court judgment applying the TCPA and remand this case to the trial court for further proceedings consistent with this opinion.


Bailey C. Moseley
Justice


Date Submitted:     September 18, 2013
Date Decided:     October 9, 2013