# Supreme Court of Texas

No. 21-0641

McLane Champions, LLC and R. Drayton McLane, Jr.,
*Petitioners*,

v.

Houston Baseball Partners LLC,
*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

CHIEF JUSTICE HECHT, joined by Justice Blacklock, dissenting.

Partners,[1] a sports-savvy group of investors, bought from Champions[2] the Houston Astros baseball club and the club's interest in Network,[3] a proposed regional sports broadcaster for the Astros and Rockets, for some $615 million. The Astros were struggling, drowning in $200 million of debt and still sinking. The new Network was supposed to brighten the team's future by reaching new viewers, but it didn't. In

---

[1] Respondent Houston Baseball Partners LLC.

[2] Petitioner McLane Champions, LLC.

[3] Houston Regional Sports Network.

the two years following the sale, the Astros' already dismal win–loss record worsened,[4] Network collapsed and was put in bankruptcy by co-owner Comcast, and Partners sued Champions and its principal, Drayton McLane, Jr., for fraud and breach of contract. Partners alleged that Defendants had falsely misrepresented that the Astros' interest in Network, its largest single asset, was worth $332 million when in fact it was worth zero.

Defendants moved to dismiss the suit, invoking the Texas Citizens Participation Act,[5] which requires dismissal of a "legal action [that] is based on, relates to, or is in response to [a] party's exercise of . . . the right of free speech[,] . . . to petition[,] or . . . of association", unless the plaintiff "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question."[6] Exercise of each right is carefully defined in the Act. "'Exercise of the right of free

---

[4] The sale closed November 2011, following the first of three consecutive seasons in which the Astros lost 100 games. But then they improved, winning more than 100 games in four consecutive full seasons beginning in 2017 (play was reduced in 2020 and 2021 due to the pandemic). They played in four World Series in six years—in 2017, 2019, 2021, and 2022—and won in two, the first and last. *See MLB Team History—Houston Astros Season Results*, ESPN, https://www.espn.com/mlb/history/teams/_/team/Hou (last visited June 25, 2023).

[5] TEX. CIV. PRAC. & REM. CODE §§27.001-27.011. The Act was passed in 2011 and amended in 2013 and 2019. Act of May 21, 2011, 82d Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961; Act of May 24, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499; Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684.

The version in effect before the 2019 amendments applies to this case, and all citations to the Act are to its provisions.

[6] TEX. CIV. PRAC. & REM. CODE § 27.005(b)-(c).

speech' means a communication made in connection with a matter of public concern."[7] "'Matter of public concern' includes an issue related to . . . economic[] or community well-being . . . [or a] public figure . . . ."[8] Defendants argue that the Act's free-speech provisions apply to Partners' claims and that Partners failed to establish the prima facie case required to avoid dismissal. The Court holds that the Act does not apply and therefore does not reach the second issue. I agree with Defendants and therefore respectfully dissent.

**I**

Partners' claims are unquestionably based on, relate to, or are in response to Defendants' communications—written and oral statements about Network's value—made during the parties' negotiations. Those negotiations were confidential and part of a private business transaction, but Defendants' communications need not have been public themselves to be covered by the Act.[9] The Act applies if Defendants' communications were made in connection with a matter of public concern.

The Astros themselves were a huge public concern in Houston. What would become of them? When would they start winning? Interest in the team was vast, conversations endless. If Defendants'

---

[7] *Id.* § 27.001(3). "'Communication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1).

[8] *Id.* § 27.001(7)(B), (D).

[9] *See Lippincott v. Whisenhunt,* 462 S.W.3d 507, 509 (Tex. 2015) ("The plain language of the statute imposes no requirement that the form of the communication be public.").

communications were "made in connection with" the Astros, there could be no doubt whatsoever that the Act applies to Partners' claims. The public concerns were the economic and community wellbeing of Houston and the future of one of its most prominent public figures, the Astros. None of this matters, the Court reasons, because in its view, the communications were made only in connection with the parties' very technical, detailed assessment of the Astros' worth and its interest in Network. If you will, the communications were only about how to count the number of gallons of fuel in the gas tank and not whether it was enough to get the buyer of the car where he wanted to go. One doesn't do the counting out of curiosity. One wants to get somewhere.

I see three problems with the Court's myopia.

## A

One is that the Court's view of Partners' case is not Partners' view, and Partners' is the view that matters. Of course, Partners alleges misrepresentations of a type that could occur in the analysis of any asset and its potential, business plan, market response, and future success. That analysis happens every day and is usually important only to the parties involved—rarely to the public. And Partners alleges injury to itself, again of little public interest in the abstract. But Partners also pleaded that its claims involve far more than its own injury:

> There are . . . many other victims of Defendants' scheme. Ultimately, fans of the Houston Astros have been injured because Defendants' misrepresentations leave Plaintiff with an impossible choice: either accept the broken network as is, and deprive thousands of fans the ability to watch Houston Astros games on their televisions, or distribute the games at market rates and take massive losses out of the Houston Astros player payroll—thereby

4

dooming the franchise for years to come. Partners pleaded a direct, significant connection between Defendants' communications, on the one hand, and the future of the Astros and Houston's interest in the team, on the other.

Acknowledging that the public would be concerned about the lawsuit and Defendants' alleged misstatements, Partners' principal immediately called a public press conference to explain. "I recognize the magnitude of the lawsuit", he said. "Misrepresentations were made about [Network] that may damage the Astros organization . . . for the next 20 years. . . . These misrepresentations have caused an enormous loss and they have hurt our fans and they have hurt our city of Houston." According to Partners itself, its claims are not merely that a private business deal went bad, as the Court would have it. Its claims are that the Astros, a public figure, together with community wellbeing in the team's hometown of Houston, were harmed in the process—clearly matters of public concern. The alleged relevance of Defendants' communications during negotiations to sell the Astros and Network to public concerns was not attenuated, as the Court thinks; it was strong and direct.

**B**

Another problem is that the three of our cases the Court cites for support actually contradict its position. In *Lippincott v. Whisenhunt*, a certified registered nurse anesthetist, Whisenhunt, sued a surgical services provider's administrator, Lippincott, for defamation.[10] The

---

[10] *Id.* at 508-509.

5

surgical group contracted with Whisenhunt's practice group to be its sole provider of anesthesiology services, but when Lippincott was hired, he immediately began to press for a change.[11] As part of his campaign, he emailed various co-employees that Whisenhunt had lost patients, misrepresented himself to be a physician, sexually harassed nurses, engaged in fraudulent behavior, failed to provide adequate coverage for pediatric cases, administered the wrong narcotic, falsified records, violated sterile protocols, was unavailable for surgeries, and was incompetent.[12] The comments do not appear to have been taken seriously. The medical director of the surgical group, Lippincott's boss, provided an affidavit stating that the group was very happy with the quality of services nurse Whisenhunt and his anesthesia group had provided and describing Whisenhunt himself as being very professional.[13] We held that the communications Whisenhunt complained of were made in connection with a matter of public concern—public health[14]—even though they were not made outside the surgical group, involved only one nurse in one professional setting, and appeared to be simply an administrator's personal vendetta.

---

[11] *See Whisenhunt v. Lippincott*, 416 S.W.3d 689, 692 (Tex. App.—Texarkana 2013), *rev'd*, 462 S.W.3d 507.

[12] *See id.*

[13] *See id.* at 694.

[14] *See Lippincott*, 462 S.W.3d at 510 ("We have previously acknowledged that the provision of medical services by a health care professional constitutes a matter of public concern.").

Coleman's job at a petroleum products and additives storage facility was to record the volume of fluid in various tanks each night.[15] His supervisor noted in company records—a communication under the Act—that Coleman had reported a volume for a tank he had not actually checked; then he terminated Coleman's employment.[16] Coleman sued for defamation, asserting that he actually had checked the tank. In *ExxonMobil Pipeline Co. v. Coleman,* we held that the Act applied to Coleman's claim.[17] Tank volumes were measured to prevent overfilling that could result in spills of noxious and flammable fluids, endangering employees and potentially the environment, and negatively impacting ExxonMobil's economic interests. Although none of that had actually happened, and although the reason for terminating Coleman was not made public and did not mention any health, safety, environmental, economic, or other public concern, it was nevertheless a communication made, "at the very least, in connection with an issue related to safety".[18] Further, we added, it had not been explained "why statements related to personnel matters cannot also be in connection with matters of public concern."[19] The Act, we emphasized, "does [not] require more than a 'tangential relationship'" between a communication and a public concern to apply.[20]

---

[15] *ExxonMobil Pipeline Co. v. Coleman,* 512 S.W.3d 895, 897 (Tex. 2017).

[16] *See id.*

[17] *Id.* at 900.

[18] *Id.* (cleaned up).

[19] *Id.* at 900-901.

[20] *Id.* at 900.

In the third of our cases on which the Court today relies, *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, the lessee and operator of an oil-and-gas well sued the lessor for telling a third party to stop buying production because the lease had terminated.[21] The defendant argued that the communication involved "a good, product, or service in the marketplace"—one description in the Act of a matter of public concern.[22] But we held that the Act did not apply because the statutory phrase means that "the communication must have some relevance to a public audience of potential buyers or sellers."[23] We acknowledged that while private communications could be covered by the Act, as we had held in *Coleman* and *Lippincott*, they must involve political, social, or other community concerns, "as opposed to purely private matters."[24] Private conversations about modest production from a single well had no relevance to a public audience and involved no public concern.[25]

We added that "not every communication related somehow to one of the broad [public concern] categories set out in [the Act] always regards a matter of public concern."[26] Now the Court says that "[w]ith this limitation, we necessarily cabined our statement in *Coleman* that the [Act] does not 'require more than a "tangential relationship" to' the

---

[21] 591 S.W.3d 127, 130 (Tex. 2019).

[22] *See id.* at 134; TEX. CIV. PRAC. & REM. CODE § 27.001(7)(E).

[23] *Creative Oil & Gas*, 591 S.W.3d at 135.

[24] *Id.*

[25] *Id.* at 136.

[26] *Id.* at 137.

public concerns identified in the statute."[27] We said nothing in *Creative Oil & Gas* about cabining *Coleman*, and the Court's current view no doubt comes as a surprise to the author of the opinion in *Creative Oil & Gas*, who joins this dissent. *Coleman* did not characterize the connection between the statement there and public concern as tangential, but it certainly said that if the connection had been no more than that, it would have been enough for the Act to apply.[28] The Court's reliance on *Coleman* today is hard to square with its simultaneous view that our opinion should not be read to mean what it said. But today's rhetorical gyrations aside, the Court certainly embraces *Coleman*'s holding: that the statement there—with far less connection to public concern than Defendants' communications in the present case—was covered by the Act.

"Taken together," the Court now says, "these cases demonstrate that communications that are merely 'related somehow to one of the broad categories' set out in the [Act] but that otherwise have no relevance to a public audience are not 'communications made in connection with a matter of public concern.'"[29] Actually, taken together, the cases demonstrate that a "matter of public concern"—or the Court's substitute standard, "relevance to a public audience"—has a very low threshold. One health-center administrator's vindictive statements about one nurse anesthetist that were disavowed by the center's director were relevant to a public audience, even though the public never knew

---

[27] *Ante* at 14 n.9.

[28] *See Coleman*, 512 S.W.3d at 900.

[29] *Ante* at 14.

9

they were made and could never have been affected by them. Likewise, a record of one employee's failure to measure the volume of one petroleum tank out of the many checked every day for three years was relevant to a public audience, even though the public never knew about it and was never at risk. But not surprisingly, a lessor's statement that its one-well lease has terminated is irrelevant to a public audience.

It is frankly difficult to fathom how the Court can conclude from the cases it cites that inconsequential statements in a single healthcare or petroleum facility are of public concern, but misrepresentations made in the prominent sale of a national baseball club for $615 million that the buyer itself claims will affect thousands of fans and the City of Houston are of no more public concern than one lessor's opinion about the one well on his lease. Partners firmly pleaded that Defendants' misrepresentations will injure Astros fans by depriving them of the ability to watch the Astros on TV or because distributing the games at market rates will result in a reduction to the player payroll. It may turn out that these concerns weren't real. (It probably already has now that the Astros are on a long winning streak and, by all appearances, are worth far more than Partners paid for them.) But surely the potential itself is a matter of public concern. If the communications in *Lippincott* and *Coleman* were matters of public concern when risks were far less likely, it is difficult to see how the communications here were not far more concerning to the public.

The stakes to the Astros, their fans, and Houston are irrelevant, the Court holds. Defendants' communications were—to return to the Act's language—"made in connection with" mere business negotiations,

never a matter of public concern, no matter the purpose and result. The Court sees this as just "a garden-variety fraud and breach-of-contract dispute between a private buyer and a private seller".[30] Like the sale of a lemonade stand, for example. The seller exaggerates the projected customer base and sales revenues, and the buyer pays more than he should and sues for fraud. Move along, folks. Nothing to see here. Just another garden-variety suit over the sale of a national baseball club involving hundreds of millions of dollars and the City of Houston sitting on the edge of its seat. If that were true, Partners could not have pleaded the public concern it did, and its principal could not have credibly asserted that concern in his press conference.

## C

Which brings us to the third problem with the Court's position. The Court worries that communications covered by the Act "must have some relevance to a public audience"; otherwise, the Act would apply to "any private business deal involving any industry that impacts economic or community well-being."[31] Assuming the Court should worry more about the Act's consequences than its construction, the Court's worries are unfounded in this case. Defendants' communications easily qualify. Partners itself claims the public is and should be concerned that misrepresentations of the value of the Astros, including Network, implicate—threaten—the viability of the club and the quality of its operations going forward.

---

[30] *Id.* at 20.

[31] *Id.* at 15.

The Court should worry that it has construed the Act too narrowly. Its position is that communications in the course of negotiations are only "made in connection with" negotiations, which are not a matter of public concern, and never in connection with the result, which is. Of course, many communications made during negotiations may have nothing to do with public concerns, and they should not be covered by the Act. But a seller's misstatements about, say, the effectiveness of a fire extinguisher, are not merely a matter of chemistry or how to negotiate the sale of extinguishers but are made in connection with the concern that product failure will endanger lives, a very public concern. Exclusion of the Act's coverage in such situations is not the liberal construction the Act requires.[32]

And in any event, the consequence of the Act's coverage is that a plaintiff must produce prima facie evidence of his case sooner in the litigation. If that is a hardship, it is justifiable. Our civil justice system has generally considered that litigation should usually be more expansive than less for the best result. But concerns over the resulting costs and delays demand attention. This Court has provided for the early dismissal of "baseless causes of action" in Rule 91a of the Texas Rules of Civil Procedure. As a matter of policy, the Legislature may also weigh those concerns and conclude, as it has in the Act, that some cases should not proceed if the plaintiff cannot make a prima facie case earlier in the litigation. This was its stated purpose in passing the Act: "to encourage and safeguard the constitutional rights of persons to petition, speak

---

[32] TEX. CIV. PRAC. & REM. CODE § 27.011(b) ("This chapter shall be construed liberally to effectuate its purpose and intent fully.").

freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."[33] The Act's application is not limited to assertions of constitutional rights and government participation, as we have noted.[34]

The Legislature could have decided when first adopting the Act that its purpose was best served by defining the Act's coverage more broadly. In the eight years that followed, many argued that the Act was being construed too broadly and called for amendments. When those amendments came, they exempted particular kinds of cases and clarified some provisions but left most of the Act's definitions and application largely unchanged. With the Legislature's having reiterated its view of the breadth of the Act in response to calls for narrowing, our concern must not be with the Act's breadth but with its text.

## D

For these reasons, I would hold that the Act applies to Partners' action. I now turn briefly to whether it has "establishe[d] by clear and specific evidence a prima facie case for each essential element" of its claims.[35]

---

[33] *Id.* § 27.002.

[34] *See Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) ("It does not follow from the fact that the [Act] professes to safeguard the exercise of certain First Amendment rights that it should *only* apply to constitutionally guaranteed activities.").

[35] TEX. CIV. PRAC. & REM. CODE § 27.005(c).

## II

Given the Court's view that the Act is inapplicable, it need not, and therefore does not, consider Partners' claims on the merits. Without analyzing those claims in detail, I explain why I think the court of appeals was in error to hold that Partners has made a prima facie case for its fraud-based claims.[36]

Partners' claims of fraud, fraud by nondisclosure, and negligent misrepresentation are based on Defendants' representation that the Zone 1 rate in Network's business model was proposed by Comcast rather than by the Astros or Rockets and was commercially reasonable and achievable and on their failure to disclose the correct information. Justifiable reliance is an element of each claim,[37] but it "can be negated as a matter of law when circumstances exist under which reliance cannot be justified."[38] One circumstance that negates justifiable reliance is an arm's-length business transaction between sophisticated parties. "Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context."[39] We have explained:

---

[36] 627 S.W.3d 398, 412 (Tex. App.—Houston [14th Dist.] 2022).

[37] *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653-654 (Tex. 2018) (listing the elements of fraud and negligent misrepresentation); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (rejecting the plaintiffs' argument that reliance is not an element of fraud by nondisclosure and explaining that "[f]raud by non-disclosure is simply a subcategory of fraud").

[38] *Orca Assets*, 546 S.W.3d at 654 (citing *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015)).

[39] *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232

14

In determining whether justifiable reliance is negated as a matter of law, courts must consider the nature of the parties' relationship and the contract. In an arm's-length transaction, the defrauded party must exercise ordinary care for the protection of his own interests. A failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party. And when a party fails to exercise such diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated. To this end, that party cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations.[40]

The court of appeals acknowledged these principles but held that Partners' burden of proof was met by the declaration of a member of Partners' due-diligence team explaining why Partners viewed its reliance as reasonable.[41] Yet the explanations essentially amount to: we trusted Comcast because it is an expert in regional sports networks and also had skin in the game.

Consistent with the principles just set out, I would hold that in the context of a $615 million dollar arm's-length transaction among very sophisticated parties for the purchase of a professional sports team, reliance on any representation or omission by the opposing party is not justifiable as a matter of law and that, therefore, Partners cannot establish a prima facie case on any fraud or misrepresentation claim.

(Tex. App.—Dallas 2012, no pet.), quoted in *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 499-500 (Tex. 2019).

[40] *Orca Assets*, 546 S.W.3d at 654 (cleaned up).

[41] *See* 627 S.W.3d at 418.

And because "liability for [civil] conspiracy depends on participation in some underlying tort",[42] that claim should have been dismissed too.

Partners' claims for breach of contract and declaratory judgment, though based on the Purchase and Sale Agreement, are largely, if not entirely, a repackaging of Partners' fraud theory. Partners alleges that Champions breached various warranties and covenants in the Agreement that the financial statements attached to it were correct. While I would not hold that Partners has failed to establish a prima facie case on those claims without further argument and consideration, holding that the other claims should be dismissed would simplify further proceedings.

*　　*　　*　　*　　*

I would reverse the court of appeals' judgment and address the question whether Partners has met its evidentiary burden under the Act. Because the Court holds otherwise, I respectfully dissent.

Nathan L. Hecht
Chief Justice

**OPINION FILED:** June 30, 2023

---

[42] *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

16