

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00332-CV

TIM BILBREY AND CHUCK HALL                                    APPELLANTS

V.

RYAN WILLIAMS                                                        APPELLEE

----------

### FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 2013-20561-158

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

This appeal arises under the Texas Citizens Participation Act (TCPA).[2]

Appellants Chuck Hall and Tim Bilbrey filed this interlocutory appeal[3] from the

----

[1]See Tex. R. App. P. 47.4.

[2]Act of May 24, 2011, 82nd Leg., R.S., ch. 341, § 1, 2011 Tex. Sess. Law Serv. 960, 960 (titling the act the "Citizens Participation Act") (codified at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011 (West 2015)).

[3]Tex. Civ. Prac. Rem. Code Ann. § 51.014(a)(12) (West 2015).

trial court's denial of their respective motions to dismiss the claims brought against them by Appellee Ryan Williams. The suit arose out of the three parties' involvement in the Trophy Club Roanoke Baseball Association (TCRBA), which organizes baseball teams for children. At the times leading up to this suit, Hall was president of TCRBA. Bilbrey was the head coach of a TCRBA team with players aged seven or younger, and Williams was the assistant coach for the same team. Williams sued Bilbrey and Hall for defamation based on statements that Bilbrey made to Hall about Williams's behavior at a TCRBA game.

Hall and Bilbrey each filed a motion to dismiss under the TCPA. The trial court denied both motions, and Bilbrey and Hall then filed this interlocutory appeal. In two issues, Bilbrey and Hall each argue that the TCPA applies to Williams's claims and that Williams failed to meet his burden to avoid dismissal. We agree, and, accordingly, we reverse the trial court's order denying the motions to dismiss and remand this case for further proceedings.[4]

**Background**

*Williams's version of events*

Unsurprisingly, the two sides presented different versions of the events leading to this lawsuit. On May 16, 2013, the team coached by Bilbrey and Williams played a game against another TCRBA team. According to Williams's petition, Hall called him the next day to talk to him about Williams's actions at the game. Hall told Williams that he had received complaints about Williams being

---

[4]*See* Tex. R. App. P. 43.2(d).

2

abusive toward the umpires at the game. Hall said that he had spoken to the umpires, who had corroborated the complaints. And because Williams already had "'two strikes against him,'" his conduct at the May 16 game jeopardized his continued participation as a coach for TCRBA.

Williams called Hall back a few hours later to deny the allegations of bad conduct and any knowledge of previous "'strikes'" against him. In this second call, Hall corrected something he had told Williams earlier: although Hall had said then that he had already spoken to the umpires from the game, in fact Hall had not yet spoken to them. Hall stated that after that phone call, however, he had then spoken to one of the umpires, who told him that the situation "'wasn't that bad.'"

Williams alleged that Hall acknowledged that the accusations against Williams "were harsh and extreme," and he therefore assured Williams that he and other TCRBA board members would soon hold a meeting with Williams and the accusers to determine the validity of the allegations. Williams alleged that he never heard back from Hall about such a meeting.

That same evening, Williams attended another baseball game. There, Williams spoke to J.R., who had been one of the umpires at the game the day before. Williams asked J.R. if anyone had spoken to him about the game the day before, and J.R. replied that no one had. Williams asked J.R. what he remembered about the game, and J.R. told him that a man who appeared to be a parent came on the field at one point and yelled at a player, and Williams had

3

asked the umpires and the other team's coach to control the situation. In his petition, Williams identified this player as his team's shortstop, but later in the record, the player is identified as Williams's son. Williams learned that the man who had yelled at his son was Brandon Emerson, a commissioner for TCRBA.

Williams alleged that he had since spoke to "numerous [unspecified] parents" who had been at the game, and none witnessed Williams act inappropriately. Williams alleged that although Hall had not told him who the person was who had made the statements about him, "[o]n information and belief," he identified that person as Bilbrey.

On May 18, Williams sent Hall an email complaining about Emerson. He followed the procedure for making complaints that was stated in the bylaws posted on TCRBA's website. The bylaws stated that a commissioner would investigate upon receiving a written, signed complaint. Williams alleged that he never heard back from Hall about this complaint.

Also on May 18, Williams attended another baseball game and again ran into umpire J.R. J.R. told Williams that after the two had spoken the day before, J.R. talked to Hall. J.R. told Hall that Williams had not been abusive during the game, and Hall responded that J.R.'s stepfather, Jason Burchell, had complained to Hall about Williams. J.R. told Williams, however, that after his conversation with Hall, he talked to his stepfather, who told him that he had spoken with Hall but not to complain about Williams.

On May 20, Williams's attorney sent Hall an email requesting a copy of any written complaint that had been made about him, the names of the TCRBA members on the committee that had been assigned to review the complaint (if one had been appointed), and a copy of the written decision of the committee (if any decision had been made). The email concluded by stating, "The lies apparently said about [Williams] have and continue to damage his reputation and cause him great distress, and he will not stand for such."

Hall responded the next day with an email stating,

> Some concerns regarding Mr. Williams'[s] on[-]field behavior were brought to my attention. Like any concern brought to my attention, I'm obligated to address, which I did. I did have a conversation with [Williams] regarding these concerns, and gave him the opportunity to give me his side of the story, which he did. Based on his feedback, the decision was made to take no further action. [Williams] certainly has the opportunity to apply to be a coach, like anyone else, going forward. At this point I consider the matter closed.

Williams's unhappiness with Hall's and Bilbrey's actions was not limited to the events of the May 16 game. In his petition, Williams also complained about the treatment of his son in the selection of players for TCRBA's All-Star teams and about statements made in a meeting with parents of the All-Star team players. Several days before the May 16 game, TCRBA had held tryouts for the All-Star team. There it was announced that there would be two All-Star teams and that a second day of tryouts would be held on May 19. Williams alleged that Bilbrey, a TCRBA commissioner, ranked Williams's son the highest of the boys who tried out for the team. Bilbrey emailed the parents of the top five ranked

players to tell them that those five players did not need to attend the second day of tryouts. On May 19, the teams were announced, and Williams's son was not placed on the top All-Star team and was instead placed on the second All-Star team.

Williams alleged that the team selection did not follow TCRBA's bylaws. On May 22, Williams's attorney sent a second letter to Hall, this time demanding an "immediate meeting" with Hall and other board members to discuss the All-Star team selection process. He stated that Williams's son should have been placed on the top team, and "this wrong can be remedied through prompt action by the TCRBA in placing" him on the top team.

Williams alleged that the next day, Hall and Bilbrey organized a meeting with all the parents of the children on the All-Star teams except for Williams and his wife. Williams alleged that at the meeting, he "and his family were blamed and made the scapegoats"; the other parents "were told that the rosters of the All-Star teams would have to be changed because of actions and threats by [Williams] and that [Williams] was filing lawsuits" against TCRBA.

After that meeting, Williams's attorney sent a third letter to Hall. The letter again complained of the "flawed" selection process for the All-Star team, but it asserted that Williams had not made any threats to file a lawsuit regarding the selection process. The attorney explained that "the Williams[es] are outraged with these recent acts and the continued disparagement of them, as well as greatly saddened by the devastation felt by their seven-year old son . . . resulting

6

from the TCRBA's fiasco of the All-Star Team selection process." The attorney remarked that it was "interesting" that the bylaws had been taken off TCRBA's website, and he queried why Hall had not been at the parents meeting "to refute such false statements and set the record straight." He demanded that Hall and TCRBA make a written apology and send a copy to all the parents who had attended the meeting.

In July 2013, Williams filed this suit, asserting claims against Bilbrey for defamation and intentional infliction of emotional distress, against both Hall and Bilbrey for conspiracy, and against Hall for aiding and abetting. He sought actual damages and exemplary damages.

*Hall's and Bilbrey's motions to dismiss*

Hall and Bilbrey each filed an answer and a motion to dismiss under the TCPA.[5] The motions contained substantially the same assertions and relied on the same evidence. In Bilbrey's motion, he stated that on the evening of May 16, Emerson texted him that he was going to file a complaint with Hall about Williams the next morning. On the morning of May 17—the day after the game in question and the day before Williams filed his own complaint against Emerson—Bilbrey called Hall and told him that Emerson was going to be filing a complaint. Later that day, Emerson called Hall and then followed up with an email complaint.

The email, which Hall and Bilbrey attached to their motions, stated that Emerson had "observed several situations in which Coach Williams acted in an

---

[5]*See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); Tex. R. Civ. P. 91a.

7

unsportsmanlike manner as required by the TCBRA Bylaws and TCRBA

Coaches Code of Conduct." He stated specifically that

> Coach Williams demonstrated a lack of respect for the umpires . . .
> by continu[]ally challenging or requesting clarification on calls that
> were not in favor of his team. . . . This . . . was very disruptive to the
> flow of the game and set a poor example for all of the players and
> fans who were forced to wait to resume play until Coach Williams
> was satisfied with the decision/explanation provided by the umpiring
> crew. Unfortunately, this is not an isolated situation as this type of
> behavior is consistent with my observations of Coach Williams on
> several occasions this spring.

After Hall received the complaint from Emerson, he and Bilbrey spoke, and

Bilbrey told Hall of his recollection of the incident at the May 16 game. Hall and

Bilbrey both attached a copy of the email Bilbrey sent to Hall a few days later,

documenting his memory of what happened:

> The incident in question occurred in the middle of the game.
> There was a play in which we were on defense with a runner on 1st
> base. A hard ground ball was hit just to the right of our first
> baseman[.] The first baseman ran over and fielded the ground ball.
> Once the grounder was in possession of the ball he attempted to
> make a tag on the runner going to 2nd base, and also running over
> to first for the double play to end the inning. The umpire called both
> players out. I was standing in the 1st base coaches box[.] Ryan
> Williams was standing in the 3rd base coaches box. The opposing
> Head Coach for Bobcat Black made an immediate appeal to the
> umpire while our team was coming off the field to hit, and Mr.
> Williams was running to our dugout from his position at 3rd base[.]
> At about the time Mr. Williams had made it over to our side of the
> field, he was in close proximity to myself, the umpire, and the
> opposing Head Coach next to the 1st base coach's box. At this
> point, the umpire reversed his call against the runner going to 2nd
> base because our 1st baseman admitted to missing the tag.
> However, Mr. Williams wasn't within proximity to hear the player
> admit the missed tag. All he had heard was that the umpire
> reversed his call.

> At the moment the call was reversed before knowing the
> circumstances, Mr. Williams had approached the umpire further and

8

was yelling at him for reversing the call. While I can't quote Mr. Williams' comments, he was arguing with the umpire about how many calls he's missed during this game and that he's now deciding to reverse his calls. Mr. Williams even turned to me and asked why wasn't I joining his argument[.] I explained to Mr. Williams the reason that the call was reversed, and that our player admitted to missing the tag. I started to tell our players that they need to get back onto the field to finish the inning because we needed one more out. As Mr. Williams was turning to go back to his position on the field at 3rd base coach's box, he made a comment referring that the league needed to get better umpires.

Hall explained that the umpires for the game were thirteen and fourteen year olds and that Williams "is a physically large man, standing over 6 feet 5 inches tall and weighing likely over 250 pounds."

Hall stated that after he received the complaint from Emerson, he gathered information and feedback from others. He discussed it with other key TCRBA board members, and they decided the next step should be to call Williams and discuss the incident. During that call, Hall "made it clear to Williams what behavior was expected of him as an Assistant Coach on the field with children."

Hall and Bilbrey asserted that this incident was not the first time that Williams's "loud on-field behavior was noted to be inappropriate for children's baseball games." As evidence, they attached emails from Faith Muskiet and Chad Morrill, a copy of a text message from Jeremy Foster, and the affidavits of Becky McClain and Brandon Hennig.

The email from Muskiet, dated April 25, 2011 (that is, almost two years before the May 16th game), was to someone named Larry. She wrote to inform him of an incident that had occurred two days before at her son's game. At one

9

point in the game, she witnessed Williams, who was a coach on the other team, "yell very loudly across the field to our coach" that her son's team's players were disrespecting the players from the other team. "He was talking so loudly that ALL the parents, family, and friends in the stands could hear him very clearly." She stated that Williams "could have expressed his concerns to the umpire or discussed, in private, the issues with our coach. There was no need to scream at the top of his lungs his concerns." Williams's yelling "made [the parents of the children on his team] yell at our coach also," and the situation "was getting out of control way too quickly." Williams "was, at this point, crossing the ball field to stand face to face with" her son's team's coach. She stated that "[a]t this point, I had seen and heard enough, so I yelled at that point that it was 6 year olds and let's act like role models."

Muskiet went on to say,

You have to understand that this is not the first time I have had an encounter with Ryan Williams. He seems to be a reoccurring nightmare. I coached a tee ball team with Karin Mesenbrink last Spring and Mr. Williams's son was on my team. Numerous times during the season, we had issues with him. . . . On several occasions, he approached me in a very aggressive manner. Karin Mesenbrink and I filed a complaint during that season, but no action was taken. . . . I am afraid he will just continue to spiral out of control.

Morrill's email was about the same April 2011 game. He corroborated Muskiet's statement that Williams yelled at him across the field, "very loudly and with an extremely hateful tone," for his players to show Williams's team respect. Williams's complaint was that Morrill's team began to leave the field as Williams's

10

last batter of the inning was rounding third base. Williams continued to shout at Morrill and waive his arms, and Morrill responded that no rules had been broken and that if Williams had an issue, he needed to bring that to Williams's head coach and the umpire. Williams walked across the field to Morrill in an aggressive way that made Morrill concerned that Williams was "going to start a physical altercation." "With this, I could very quickly see that talking through the matter was not an option so I told him to speak with the umpire and tried to quiet the situation as quickly as possible."

In Foster's text-message, he described Williams as a coach he would not want his child to play under. He described Williams as "[j]ust one of those guys that everything has to go his way and cause a ruckus to fight for it. Could be a nice guy but just is way over the top." His child's team had played Williams's team twice during the season, "and both games he caused a scene for some reason or another." Foster concluded, "I think he is just a loud personality, that is used to getting his way. So it comes across pretty harsh when you are playing a game with 7 year olds."

In McClain's affidavit, she stated that she had seen Williams arguing with the umpires at the May 16th game. She stated that "Williams is twice the size of the umpires who are just kids. [Williams] would not give the umpires a break and kept arguing with them." She heard him say something to the effect that "the league should get decent umpires." She stated that Williams "has a loud voice and [is] prone to arguing with the umpires."

11

In Hennig's affidavit, he did not talk about the May 16 game specifically, but he gave a few examples of Williams being "'over the top.'" He stated, "I have witnessed Ryan Williams become very emotional and sometimes have heated conversations with the umpires he didn't like or when a wrong call was made. The umpires are kids and due to Ryan's height and large body frame he can be intimidating to these young umpires."

In their motions, Hall and Bilbrey stated that the day of the meeting with the All-Star parents, Hall had been served with a petition for a notice to take a pre-suit deposition by Williams's attorney.[6] They attached to their motions a copy of this petition that Williams had filed in the district court for authorization to take Hall's deposition.[7] The petition sought Hall's deposition "to investigate potential claims that Williams has relating to defamatory statements made to Hall." It stated that Williams sought to learn information including who made the allegations to Hall, the specifics of the allegations, the investigation of the allegations, "the efforts to exclude Williams from" TCRBA, and any other allegations of misconduct by Williams.

Hall and Bilbrey asserted that Williams's claims should be dismissed under the TCPA. They asserted that Williams's claims were "all based on [Williams's] attempts to silence Bilbrey, and other parents including Hall . . . who are looking

---

[6]The meeting was held May 23. The file stamp on this petition shows that it was filed on May 22, and the certificate of service states that it was emailed to Hall that same day.

[7]See Tex. R. Civ. P. 202.1.

12

out for the protection of our youth." Hall asserted that "[t]he safety and interaction between adult coaches and children umpires and players is a matter of public concern not just within TCR[]BA, but on a global scale," and "[a]ny speech regarding observed behavior or interaction between an adult and an adolescent umpire is considered an exercise of free speech which addresses a matter of public concern as it deals directly with the well-being and safety of children in the community."

Hall and Bilbrey argued that Bilbrey had a moral duty to report Williams's behavior to Hall, that witnesses had the right to speak up and tell about what they had seen, and that Hall had the right to investigate the matter. They asserted that any comments made by Bilbrey or anyone else regarding behavior of Williams they had witnessed "are precisely the type of speech the Legislature intended to encourage and protect" through the TCPA. Accordingly, they requested that the trial court dismiss Williams's claims and award them court costs, expenses, reasonable attorney's fees, and sanctions.

*Williams's response to the motions to dismiss*

In Williams's response to the motions, he argued that the TCPA did not apply to "Bilbrey's actions in calling [Williams] an abuser" and that if the TCPA did apply, he had established a prima facie case for the essential elements of his claims. Williams attached to his response his own affidavit and the affidavit of Misty Engel and Travis Engel, parents who had been at the May 16 game. The

13

Engels stated that they did not see Williams behave in an inappropriate manner and have never seen him act in an aggressive or intimidating manner.

In his affidavit, Williams repeated many of the statements that he had included in his petition, including his description of his conversations with Hall. Williams stated that after his first conversation with Hall, he concluded that "an individual or individuals were trying to get [him] kicked out of the" TCRBA. He then told several people involved with TCRBA about the accusation, including the coach and assistant coach of the opposing team at the May 16 game. Those coaches told him that they had not made a complaint and that no complaint was warranted.

Williams also attached an affidavit from his wife Amber Williams. She stated that "[u]pon learning that [Williams] was being accused of being abusive to the umpires at the game, I sent a text message . . . to Becki McClain as to whether she observed [Williams] being abusive." She attached to her affidavit a copy of the text message exchange:

> [Amber:] Hey girl . . . Omg we have to talk . . . Do u think [Williams] was abusive to any of the refs last night at [the] game??
>
> [McClain:] Abusive???? Like for real abusive or just arguing?
>
> [Amber:] The term abusive is what was said . . .
>
> [McClain:] Ok what was said about ehat [sic] . . . and the only testy thing [I] remember is when the other team got mad[] that [Williams's son] tagged that kid
>
> [Amber:] Ya and that kids dad ran out on the field and started yelling at [Williams's son] . . . And Ryan [text missing] get him off the field and when he did not he asked the refs to do it!!

14

[Amber:] The guy was yelling at [Williams's son] to apologize and he needs to learn about what a force is . . .

[Amber:] That's the only time [Williams] said anything all night . . . [Ellipses in original.]

Williams further included the affidavit of two City of Roanoke police officers stating that they had supervised Williams when he had been an officer for the city, that he had never been involved in any internal affairs investigations while working there, and that he was eligible for rehire there.

Williams also filed a motion for continuance asking for time to take the depositions of Bilbrey, J.R., McClain, and Hennig.[8] The trial court denied the motions to dismiss. Hall and Bilbrey then filed this interlocutory appeal.

**Discussion**

Hall and Bilbrey each raise two issues on substantially the same grounds. They both argue in their first issue that they met their burden to show that the TCPA applies to Williams's claims. They both argue in their second issue that Williams did not meet his burden of providing clear and specific evidence showing a prima facie case for each essential element of his claims. We begin with their first issues and consider whether the TCPA applies to Williams's claims against them.

**1. Origin of anti-SLAPP laws**

George W. Pring and Penelope Canan created the term "Strategic Lawsuits Against Public Participation"—SLAPP—to describe civil actions brought

---

[8]*See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(b).

for the purpose of stifling political expression.[9]  In their work on the subject, Pring and Canan pointed out examples of lawsuits filed against citizens and groups for such actions as "going to a public meeting and signing the attendance sheet," "[c]irculating a petition for signatures," "[r]eporting police misconduct," "[f]iling administrative agency appeals," "[l]obbying for reform legislation," "[b]eing a named party in a non-monetary, public-interest lawsuit," and "[s]ending a letter to public officials."[10]  Their study of these lawsuits found that "[f]ar from unusual, SLAPPs are found in every jurisdiction, at every government level, and against every type of public issue" that they had investigated.[11]

As they explained, their study found that SLAPPs were filed by parties on one side of a public dispute in order punish or prevent opposing points of view and to transform the public dispute "into a private, legal adjudication, shifting both forum and issues to the disadvantage of the other side."[12]  They found that this tactic works well for SLAPP filers because "[t]he costs immediately imposed on the defendants or targets can be substantial."[13]  Pring and Canan found that

---

[9]*See* George W. Pring & Penelope Canan, *Strategic Lawsuits Against Public Participation ("Slapps"): an Introduction for Bench, Bar and Bystanders* (Introduction to SLAPPs), 12 Bridgeport L. Rev. 937, 938 (1992); *see also* George W. Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 Pace Envtl. L. Rev. 3 (1989), *available at* http://digitalcommons.pace.edu/pelr/vol7/iss1/11.

[10]Pring & Canan, *Introduction to SLAPPs*, at 938.

[11]*Id.* at 940.

[12]*Id.* at 941.

[13]*Id.* at 942.

most filers of SLAPPs lose their suits but win at achieving their purpose; although the "vast majority" of such suits are dismissed, they succeed in chilling public discussion.[14]

To address the same concerns that Pring and Canan raised in their work, many states have enacted statutes intended to cut down on detrimental and abusive SLAPP actions.  Texas is one such state.

## 2.  The TCPA

The TCPA, which was adopted in 2011,[15] is set out in chapter 27 of the civil practice and remedies code.[16]  Section 27.002 sets out the law's purpose, which is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."[17]  Section 27.011 states that the TCPA "shall be construed liberally to effectuate its purpose and intent fully."[18]  Thus, we must construe all parts of the TCPA liberally while keeping in mind its intent to protect both the constitutional rights of defendants and the right of plaintiffs to bring meritorious lawsuits.

---

[14]*Id.* at 941–44.

[15]Act of May 24, 2011, 82nd Leg., R.S., ch. 341, § 1, 2011 Tex. Sess. Law Serv. 960, 960.

[16]Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011.

[17]*Id.* § 27.002.

[18]*Id.* § 27.011(b).

Section 27.003 provides a procedure for obtaining a dismissal of the action and for a suspension of discovery while the trial court considers the motion to dismiss.[19] Section 27.005 sets out the relative burdens for prevailing on a motion to dismiss under section 27.003 and for overcoming such a motion.[20] The section requires the trial court to dismiss the action if the defendant seeking to have the suit dismissed "shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association."[21]

The section provides, however, that if the plaintiff then "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question," the trial court may not dismiss the action.[22] This section of the TCPA provides a plaintiff the opportunity to overcome a spurious motion to dismiss brought under the TCPA.[23]

Section 27.001 defines terms for purposes of the TCPA. That section includes the following relevant definitions:

---

[19] *Id.* § 27.003.

[20] *Id.* § 27.005.

[21] *Id.* § 27.005(b).

[22] *Id.* § 27.005(c).

[23] *Id.* § 27.002.

18

(1) "Communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic.

(3) "Exercise of the right of free speech" means a communication made in connection with a matter of public concern.

(7) "Matter of public concern" includes an issue related to:

> (A) health or safety;
>
> (B) environmental, economic, or community well-being;
>
> (C) the government;
>
> (D) a public official or public figure; or
>
> (E) a good, product, or service in the marketplace.[24]

### 3. Standard of Review

In reviewing a trial court's ruling on a motion to dismiss under the TCPA, "we review de novo whether (1) the movant satisfied the initial burden imposed by section 27.005(b), (2) the nonmovant satisfied the burden imposed by section 27.005(c), and (3) the movant satisfied the burden imposed by section 27.005(d)."[25] In our review, "we consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."[26]

### 4. The TCPA applies to Williams's claims

Hall contends that the TCPA applies because Bilbrey's statements about Williams's actions at the May 16 game relate to the health and safety of children

---

[24]*Id.* § 27.001.

[25]*United Food & Commercial Workers Internat'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 511 (Tex. App.—Fort Worth 2014, no pet.).

[26]*Id.* at 511–12; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a).

19

in the community. Specifically, he states that "all of Williams'[s] claims arise out of reports that were made by concerned parents about Williams'[s] conduct as third base coach during a baseball game comprised of 7-year old boys with 13-14 year old umpires," and the suit therefore "involves communications relating to the mental and physical health and safety of young children who participate in organized sports." Thus, the claims "involve the exercise of the right of free speech on a matter of public concern relating to the health and safety of the children participating in the game."

Like Hall, Bilbrey argues that Williams's suit arises out of free speech on a matter of public concern because the statements address the safety of children in the community. He also relies on the "community well-being" provision of the definition of public concern. He argues that "[i]t is undisputed that youth sports are important community activities in raising our children and teaching them important life lessons," and "[t]he safety and interaction between adult coaches and children umpires and players, is a matter of public concern as it relates to the community's well-being"; "[a]ny speech regarding observed behavior or interaction between an adult and an adolescent umpire would therefore be considered an exercise of free speech which addresses a matter of public concern as it deals directly with the well-being and safety of children in the community."

We agree that Williams's suit is based on statements Bilbrey made on a matter involving the well-being and safety of children in the community, that the

statements were therefore on matters of public concern, and that the suit therefore is based on and arises out of the right of free speech as defined by the TCPA.[27] Bilbrey and Hall produced evidence suggesting that Williams has a history of losing his temper and acting aggressively at TCRBA games, including toward the teenage children who umpire the games. It was in that context that Bilbrey made the disputed statements to Hall.

Further, Williams alleged that Bilbrey called him "an abuser" and said that he abused teenage umpires at a game. Bilbrey's version of what he had said used less-strong language but still described Williams as losing his temper over a reversed call at a baseball game played by seven-year-old children, approaching the teenage child who was refereeing the game, and yelling at him over the reversed call. Bilbrey's statements relate to the health, safety, and well-being of the children of the community who play in TCRBA.[28] Accordingly, these statements were statements on a matter of public concern, and Bilbrey made the statement in the exercise of his right of free speech under the TCPA.

---

[27]In this opinion, we use the terms "free speech" and "public concern" as those terms are used in the TCPA. We do not consider and make no comment on whether the statements at issue in this case are matters of "public concern" as that term is used in defamation law outside the context of the TCPA.

[28]*Cf. Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 467, 137 Cal. Rptr. 3d 455, 465–66 (2012) (applying California's anti-SLAPP law, which applies to statements of public interest—construed as any issue in which the public is interested—to the statements in the case and holding that the safety of children in sports is an issue of public interest).

21

In Williams's response to the motions to dismiss, he argued that the TCPA did not apply because the statements at issue were not related to community well-being or health and safety. In his appellee's brief, he makes an additional, different argument, asserting that because Bilbrey's statements "were communicated to Hall verbally and privately," and because they did not constitute participation in government, the TCPA does not apply to them.

Williams points to language in the section explaining the TCPA's purpose, which, as we have observed, states that the Act's purpose is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and *otherwise participate in government* to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."[29] Williams argues that this "otherwise participate" language indicates an intent to limit the TCPA's application to speech that rises to the level of participating in government.

Like the Dallas Court of Appeals, we decline to read this section in isolation from the rest of the Act.[30] We must consider this section in the context of the entire statutory scheme. And like that court, we point out that the

---

[29]Tex. Civ. Prac. & Rem. Code Ann. § 27.002 (emphasis added).

[30]*See Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, INC.*, 402 S.W.3d 299, 308 (Tex. App.—Dallas 2013, pet. denied).

22

definitions of "freedom of speech" and "public concern" do not include only speech that would constitute participation in government.[31]

Further, the statement of intent by the TCPA's author included these observations:

> Citizen participation is the heart of our democracy. Whether petitioning the government, writing a traditional news article, *or commenting on the quality of a business*, involvement of *citizens in the exchange of idea[s]* benefits our society.
>
> Yet frivolous lawsuits aimed at silencing those involved in *these activities* are becoming more common, and are a threat to the growth of our democracy. . . .
>
> . . . The Texas Citizen Participation Act would allow defendants—who are sued as a result of exercising their right to free speech *or* their right to petition the government—to file a motion to dismiss the suit.[32]

Thus, the TCPA was intended to provide protection for the involvement of citizens in the exchange of ideas, not just in speech related to participating in government. And the language of the TCPA, including its definition of "public concern," guides us to the conclusion that the Act does not apply only to statements made in participating in government. Accordingly, we hold that the

---

[31] *See id.* (pointing out that the legislature had "defined the protected activity of 'exercising the right of free speech' to encompass much broader activity" than participation in government and noting that the "'exercise of the right of free speech'" is defined in the TCPA "as a communication made in connection with a matter of public concern," which "is statutorily defined to encompass five different subjects including, without any limitation to participation in government, an issue related to a good, product, or service in the marketplace").

[32] Senate Research Ctr., Bill Analysis, Tex. H.B. 2973, 82nd Leg., R.S. (2011) (emphasis added).

"otherwise participate in government" language does not express a limitation of the TCPA's application that would prevent the Act from applying in this case.

On the same argument, Williams also relies on language in the Texarkana Court of Appeals's opinion in *Whisenhunt* stating that the free speech to which the TCPA applies only includes "free speech that rises to such a level that it can be considered participation in government."[33] The TCPA does contain a limitation that the speech at issue must be related to a matter of public concern, and thus not all speech qualifies as free speech under the TCPA. But the speech in this case was on a matter of public concern, and therefore the TCPA applies.

Williams further relies on *Whisenhunt* to argue that the TCPA does not apply to statements made in private conversations, and thus, the TCPA does not apply to the speech here because Bilbrey made his statements in a private conversation to Hall. In deciding *Whisenhunt*, the Texarkana court reviewed case law on the TCPA involving free speech and concluded that in all of the cases, "the allegedly actionable statements not only involved matters of public concern, they were also readily available to the public."[34] The court

---

[33] *See Whisenhunt v. Lippincott*, 416 S.W.3d 689, 697 (Tex. App.—Texarkana 2013, pet. filed).

[34] *Id.* at 699.

24

consequently held that "if a person is not exercising his right to speak freely in public, the TCPA will not apply to suits filed against him."[35]

We agree that the speech to which the TCPA applies has to be "public" in the sense that the speech must be on a matter of public concern. But the language of the Act contains no limitation that would restrict its application only to speech made in a public forum. By its own provisions, the TCPA applies to a communication in any form or medium.[36] And the definitions of free speech and public concern do not include language restricting them only to speech made in a public forum. We agree with *Whisenhunt*'s conclusion that the TCPA does not apply to *all* speech. But we disagree with the limitations drawn by that court.

The question of whether Williams behaved angrily and aggressively toward children of the community and whether he should be allowed to continue to be a coach on a team on which children from the community play and which teenagers umpire are questions related to the well-being of the community. Statements about an adult losing his temper over a call in a baseball game played by young children and then approaching the teenage child who made the call and yelling at him are statements that related to the safety of children in the community.

Because Hall and Bilbrey showed by a preponderance of the evidence that Williams's claims against them were based on, related to, or were in response to

---

[35]*Id.* at 700.

[36]Tex. Civ. Prac. & Rem. Code Ann. § 27.001.

25

the exercise of the right of free speech, they satisfied section 27.005(b).[37]  We sustain Bilbrey's and Hall's first issues.  Accordingly, the trial court was required to dismiss Williams's claims unless he showed by clear and specific evidence a prima facie case for each essential element of his claims against them.[38]

## 5.  Williams did not meet his burden under the TCPA

### 5.1.  Defamation

Bilbrey argues in his second issue that Williams did not meet his burden of providing clear and specific evidence on each element of his defamation claim. Prima facie evidence is "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'"[39]  While the TCPA requires that the evidence used to meet that minimum quantum be "clear and specific," it does not define "clear and specific."  Other courts have said that "clear and specific evidence" is evidence that "is 'unaided by presumptions, inferences, or intendments,'"[40] or that is "'free from obscurity or ambiguity.'"[41]  And the TCPA tells us that in deciding whether dismissal is appropriate, courts must consider "the pleadings and supporting and opposing affidavits stating the facts on which

---

[37] *See id.* § 27.005(b)(1).

[38] *See id.* § 27.005(c).

[39] *In re Lipsky*, 411 S.W.3d 530, 539 (Tex. App.—Fort Worth 2013, orig. proceeding) (citations omitted).

[40] *Rehak Creative Servs Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citation omitted).

[41] *Farias v. Garza*, 426 S.W.3d 808, 814 (Tex. App.—San Antonio 2014, pet. filed) (citation omitted).

the liability or defense is based."[42]  Williams argues that he produced sufficient evidence to satisfy section 27.005(c), and he argues alternatively that his motion for continuance to take discovery should have been granted.

Generally, to prevail on a defamation claim, a plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with either actual malice, if the plaintiff is a public official or a public figure, or negligence, if the plaintiff is a private individual, regarding the truth of the statement.[43]  A defamatory statement is one that "'tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation.'"[44]  "To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace.  But a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable."[45]

A statement is defamatory per se under the common law if it involves "one of the following categories:  (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling;

---

[42] *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a).

[43] *See Lipsky*, 411 S.W.3d at 543.

[44] *See id.* (citation omitted).

[45] *Farias*, 426 S.W.3d at 816 (citing *Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.)).

27

or (4) imputation of sexual misconduct."[46]  Williams asserted in his response that the statements made by Bilbrey were defamatory per se, but he does not explain why.  Williams stated in his petition and in his affidavit attached to his response that "[h]e operates a business located in Roanoke employing more than 65 people."  But he did not explain what that business is, how Bilbrey's statements injured him in his profession, or how the statements fit any other category of defamation per se.  Further, he produced evidence indicating that he was eligible for rehire with the Roanoke police, so Bilbrey's statements had not injured him in that profession.

The statements do, however, relate to his position as assistant coach of his son's baseball team, and it is his reputation in that role and in the community of TCRBA that he is concerned about in this suit.  Even in that community, however, we cannot say that Bilbrey's statements to Hall were defamatory per se.

That the statements need extrinsic evidence to show their defamatory nature is illustrated in Amber Williams's text exchange with McClain.  Amber asked if McClain had remembered Williams being abusive to one of the umpires, and McClain asked in response, "Like for real abusive or just arguing?"  McClain's response reflects the fact that the word "abusive" can have a number of different meanings encompassing a range of possible accusations, with

---

[46]*Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.] 2013), *judgm't withdrawn*, No. 14-12-00015-CV, 2014 WL 6679562 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014, no pet.) (mem. op.).

28

Bilbrey's version of events on the mild end and criminal acts on the serious end.[47]

In defamation claims, context matters.[48] We cannot say as a matter of law that the word "abusive" is defamatory per se without knowing the context of the statement. Williams, however, provided none to the trial court. In neither Williams's petition nor his affidavit did he make clear what the conversation he had with Hall encompassed.[49] We expressly do not hold that statements to the effect that a person is abusive can never be defamatory per se. But without providing the context of the statements, there was no basis in this case for the trial court to conclude that the statements were defamatory per se. To the extent that Williams concluded from the conversation with Hall that Bilbrey had accused

---

[47] *See, e.g.*, Tex. Penal Code Ann. § 22.04 (West Supp. 2014) (describing the offense of injury to a child fourteen years of age or younger); *see also* Tex. Fam. Code Ann. § 261.001 (West 2014) (defining abuse of child for purposes of the chapter relating to investigation of a report of child abuse); *cf.* Webster's Third New International Dictionary Unabridged 8 (2002) (defining "abuse" and including among the definitions "to attack or injure with words: reproach coarsely" and "language that condemns or vilifies"). *See generally Young v. Krantz*, 434 S.W.3d 335, 343 (Tex. App.—Dallas 2014, no pet.) (holding that statements are not defamatory merely because they are abusive).

[48] *See Kinney v. Barnes*, 443 S.W.3d 87, 97–98 (Tex. 2014) (recognizing the "inherently contextual nature of defamatory speech" and stating that "[i]n evaluating whether a statement is defamatory, the court construes it 'as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement'" (citation omitted)), *cert. denied*, No. 14-642, 2015 WL 231998 (U.S. Jan. 20, 2015).

[49] *See Young*, 434 S.W.3d at 343 (stating that an expression of opinion cannot form the basis of a defamation claim and that "[w]e classify a statement as fact or opinion based upon the statement's verifiability and the entire context in which the statement was made").

29

him of more than the behavior that Bilbrey described in his email to Hall, Williams produced no evidence that Bilbrey made any such accusation.

If the statements were not defamatory per se, then Williams would have to prove that the statements caused him injury.[50] Williams complained that the statements damaged his reputation and caused him mental anguish. But Williams produced no evidence that Hall, in investigating the allegations, repeated Bilbrey's statement that Williams had been "abusive." There is no evidence that Bilbrey repeated the statements to anyone else. Williams produced evidence that *he* told several people in TCRBA of the allegations. And people who were at the game could draw their own conclusions about the allegations.

As for mental anguish, within hours of the initial phone call from Hall, Hall reported to Williams that the umpire he had spoken with had said that the events were "not that bad," thus indicating that Hall did not accept Bilbrey's statements unquestionably. In the next few days, Williams spoke to several people who had been at the game and agreed with him that he had not been abusive. Hall told Williams and his attorney that no action would be taken and that Williams could still apply to coach for TCRBA in the future. If Williams suffered loss of reputation or mental anguish, there is no evidence that it was due to Bilbrey making statements to Hall about Williams's behavior at the May 16 game.

---

[50] *See Lipsky*, 411 S.W.3d at 543.

Regarding the All-Star parents meeting, Williams produced no evidence about what was said at that meeting. By his own admission, he was not at the meeting, and he did not explain how he came to know what was said at the meeting. Further, even assuming that Williams is correct about statements made about him at that meeting, the statements were not defamatory per se, and he did not meet his burden to show by clear and specific evidence that the statements were false. He *was* demanding that the roster be changed, and his attorney had already sent Hall three demand letters and filed a pre-suit deposition petition.

From our reading of Williams's petition, although he complained about the meeting, he did not base any part of his defamation claim against Bilbrey on what was said at this meeting. But to the extent that he did so, he failed to provide clear and specific evidence that Bilbrey made defamatory statements about him at the meeting or that any statements Bilbrey made there were false.

We hold that the facts established by Williams as summarized above did not provide a "'minimum quantum of evidence necessary to support a rational inference'" that Williams met his burden with regard to the essential elements of his defamation claim against Bilbrey.[51] We sustain Bilbrey's second issue as to the defamation claim.

---

[51] *See Lipsky*, 411 S.W.3d at 539 (citation omitted).

## 5.2. Intentional infliction of emotional distress

Williams also asserted a claim for intentional infliction of emotional distress against Bilbrey. A plaintiff asserting a claim for IIED must prove that "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe."[52] IIED is "a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress."[53] Accordingly, "[w]here the gravamen of a plaintiff's complaint is really another tort, [IIED] should not be available."[54]

Williams did not set out either in his petition or in his response to the motions to dismiss any basis for his IIED claim other than Bilbrey's statement, and he did not explain how any of his evidence supported an independent IIED claim. Because the factual basis of Williams's IIED claim is the same as his defamation claim, the gravamen of Williams's complaint is defamation. Consequently, Williams did not provide a "minimum quantum of evidence

---

[52] *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999); *see also Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998).

[53] *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (citation omitted).

[54] *Id.*

necessary" to support his IIED claim.  We sustain Bilbrey's second issue as to this claim.

## 5.3.  Conspiracy

Williams also alleged that Hall and Bilbrey conspired to defame him.  The essential elements of a civil conspiracy claim are:  "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.'"[55]  "A defendant's liability for conspiracy depends on 'participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.'"[56]  "[M]erely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy.  Instead, 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'"[57]

In his response to the motions to dismiss, Williams did not specifically discuss the elements of conspiracy or what evidence supported his conspiracy claim.  Because we have held that Williams did not produce clear and specific evidence to support his defamation claim, we further hold that Williams did not provide at least a "minimum quantum of evidence necessary to support a rational

---

[55]*Lipsky*, 411 S.W.3d at 549 (citation omitted).

[56]*Id.* (citation omitted).

[57]*Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (citations omitted).

inference" that Hall and Bilbrey had conspired to defame Williams. We sustain the remainder of Bilbrey's issue and Hall's issue as to the conspiracy claim.

## 5.4. Aiding and abetting

Williams's final claim is for aiding and abetting. He alleged that Hall "assisted, encouraged, and participated in the actions of Bilbrey and his verbal attacks" on Williams. Aiding and abetting claims "require the actor, with unlawful intent, to give substantial assistance and encouragement to a wrongdoer in a tortious act."[58] Aiding and abetting, like conspiracy, is a dependent claim that is "premised on" an underlying tort.[59] In Williams's response to Hall's and Bilbrey's TCPA motions, he did not particularly discuss the elements or facts of his aiding and abetting claim "or argue that the claim could survive independently from the civil conspiracy claim."[60] For the same reason that Williams's conspiracy claim fails, so too does his aiding and abetting claim. We sustain the remainder of Hall's second issue. We therefore consider Williams's alternative argument that the trial court should have granted his motion for a continuance.

---

[58] *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. filed).

[59] *Id.*

[60] *See Lipsky*, 411 S.W.3d at 552 (observing that there is uncertainty in the law about whether Texas recognizes an aiding and abetting cause of action separately from a civil conspiracy claim and holding that the trial court abused its discretion by denying the TCPA motion to dismiss when the plaintiff did not discuss the elements or facts of its aiding and abetting claim or argue that the claim could survive the dismissal of the conspiracy claim).

**6. Williams did not show his entitlement to a continuance**

Williams asserts that when the trial court denied Hall's and Bilbrey's motions to dismiss, it also denied Williams's motion for a continuance to take discovery, that the denial was an abuse of discretion, and that if this court sustains Hall's and Bilbrey's two issues, then he is entitled to limited discovery.

When a motion to dismiss under the TCPA is filed, discovery is suspended.[61] The trial court may nevertheless allow "specified and limited discovery" on a motion by the court or by a party and on a showing of good cause.[62]

Williams stated in his motion for continuance that he was entitled to take the deposition of (1) J.R., (2) McClain, and (3) Hennig. But his reason for taking the depositions was to support his claim that he was not abusive toward umpires at the May 16 game. Our disposition of this appeal, however, does not depend on whether Williams produced evidence to support his version of events at the May 16 game. Williams's reason for taking their depositions is therefore moot, and he did not establish the requisite good cause for discovery.

Williams also requested to take Bilbrey's deposition, but he did not explain for what purpose he wanted to do so. Accordingly, he did not show good cause

---

[61]Tex. Civ. Prac. & Rem. Code Ann. § 27.003.

[62]*Id.* § 27.006(b).

35

for the specific and limited discovery allowed under the TCPA.[63] We overrule Williams's alternative issue.

## Conclusion

Having sustained Hall's two issues and Bilbrey's two issues, and having overruled Williams's alternative issue, we reverse the trial court's order. We remand this case for the trial court to dismiss Williams's claims and to consider any other relief to which Bilbrey and Hall may be entitled, including an award of costs, attorney's fees, and sanctions.[64]

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED: March 12, 2015

---

[63] *See id.*

[64] *See id.* § 27.009.

36